**GARO ALEXANIAN,** *Individually and in his*       **CIVIL ACTION NO. 07-00806**
*capacity as executive director of the Companion*
*Animal Network, an unincorporated association*

**VS.**       **JUDGE DOHERTY**

**JASON BROWN,** *Individually and in his*
*official capacity as a reporter of the Daily Advertiser,*
**EDWARD "TED"POWER,** *individually and in his*
*capacity as publisher of the daily advertiser,*
**THE DAILY ADVERTISER**
**GANNETT CO., INC.**       **MAGISTRATE JUDGE METHVIN**

### *REPORT AND RECOMMENDATION*
### *(Rec. Doc. 46)*

Before the undersigned is Defendants' Special Motion to Strike Pursuant to Louisiana C.C.P. Art. 971. The motion is opposed.

### *Background and Argument of Parties*

Pro se plaintiff filed this action for, *inter alia*, defamation and libel against defendants, alleging he was defamed by defendants in two separate but related publications. The first publication alleged to be defamatory was an article (hereinafter the "Story"), published on September 1, 2006, written by defendant Jason Brown; the second was a correction to the Story (the "Correction"), published on September 2, 2006. Both were published in The Advertiser, a newspaper based in Lafayette, Louisiana.[1]

The Story written by Brown addressed allegations made by plaintiff Garo Alexanian in a News Release about euthanasia and other practices by the Lafayette Parish Division of Animal

---

[1]A copy of the *News Release* of August 28, 2006, by plaintiff, is attached hereto, as well as a copy of the *Story* and the *Correction*.

Control at the Roicy Duhon Animal Shelter in Lafayette, Louisiana ("Roicy").  Among the

criticisms in the News Release were allegations that then acting Lafayette Police Chief James

Craft's refused to accept a grant obtained by plaintiff for a year's supply of sodium pentobarbital

(an euthanasia agent), to be used in place of carbon monoxide gas at the shelter.   The Story also

addressed statements made in the News Release concerning plaintiff's past accomplishments in

obtaining grants for Lafayette and other parishes in the wake of Hurricane Katrina, and a

statement in the News Release describing plaintiff's organization, Companion Animal Network

("CAN") as "one of the lead agencies in procuring recovery funding for over one dozen

Louisiana Parish animal control agencies. . . ."[2]

The copies of the challenged publications submitted with the briefs are blurry and

difficult to read.  Since the challenged publications are brief, their content and headlines will be

reproduced herein for easy reference, as well as attached to this report:

**Group slings mud at Animal Control**
**Allegations against agency prove untrue.**

A New York-based animal rescue organization is making unwarranted accusations
against the Lafayette Parish Animal Control Division regarding its practices and
management, according to local and national officials.

In a news release from the Companion Animal Network, Executive Director Garo
Alexanian claimed Lafayette officials turned down "a major grant" for a years
supply of sodium pentobarbital, a chemical used in injections to euthanize
animals, which would have helped it replace its practice of using a carbon
monoxide chamber to euthanize animals.

This, he said, followed the announcement that his organization was instrumental
in procuring funding for an animal pick up truck work nearly $40,000 for the
parish, one of more than a dozen across the state.

---

[2]*News Release.*

Alexanian also claims his organization is working under the Maddie's Fund, which provides grant monies to organizations involved in animal rescue.

However, no one at Maddie's Fund was aware of Alexanian or expressed any affiliation with his organization.

As for the donated trucks, Laura Lanza, a southern regional manager for the American Society for the Prevention of Cruelty to Animals, claims Alexanian simply brought the idea of getting new trucks for several Louisiana parishes to the A.S.P.C.A. and the Humane Society of the United States and that those two agencies took it from there. She said she would not describe his work as "instrumental."

And in Lafayette, Jim Craft, acting Lafayette police chief, said he only has spoken with Alexanian through an e-mail in which he asked Alexanian why he was making allegations against the department and citing the office as a source.

As for the unit's policies, Craft said it does not have the staff, resources or space to perform any other type of euthanizing than what already is in place.

The following day, The Advertiser issued the second complained of publication, the Correction, as follows:

**Correction: Headline did not reflect article**

A headline on a story on Page 1C Friday about Lafayette Parish Animal Control's method of euthanizing animals did not reflect the context or content of the story. Garo Alexanian, an animal-rights activist from New York , has criticized the parish for its method of euthanizing animals and has taken steps to change the process. Alexanian's group has sought a grant from Maddie's Fund, a pro-animal organization.

Plaintiff alleges the Story and Correction are defamatory and libelous, and that "virtually every sentence in the front page article had conclusory allegations of falsity attributed to Plaintiff without any reference to any information warranting such conclusions."[3]

---

[3]See *First Amended Complaint* (rec. doc. 4), p. 5, ¶ 17.

Plaintiff's complaint focuses on four groups of statements that he alleges are false and defamatory. The first group concerns the statement in the Story that "[a] New York-based animal rescue organization is making unwarranted accusations against Lafayette Parish Animal Control Division regarding its practices and management, according to local and national officials" and "Alexanian claimed Lafayette officials turned down "a major grant" for a years supply of sodium pentobarbital. . . . ." Plaintiff alleges these statements are defamatory and false because plaintiff's accusations were warranted, as Lafayette officials did in fact turn down the grant of sodium pentobarbital.

The second group surrounds plaintiff's role in procuring funding for the animal control pick-up trucks. Plaintiff contends defendants defamed him by denigrating and falsely minimizing his role in same. Plaintiff complains of the following statements: "he said . . .that his organization was instrumental in procuring funding for an animal pickup truck worth nearly $40,000 for the parish. . . ." [but that] "[a]s for the donated trucks, Laura Lanza . . . claims Alexanian simply brought the idea of getting new trucks for several Louisiana parishes to the A.S.P.C.A. and the Humane Society of the United States and that those two agencies took it from there" [and that] "she would not describe his work as 'instrumental'." Plaintiff alleges these statements were misquotes of Laura Lanza, a southern regional manager for the American Society for the Prevention of Cruelty to Animals (ASPCA), who did not say any such thing.[4] Plaintiff has attached an email from Laura Lanza in support of his allegation that she was misquoted.[5]

---

[4]*Ibid.*, pp. 6,7 ¶ 19.

[5]*Ibid.*, Exhibit C.

The third group of statements were in reference to plaintiff's grant accomplishments and efforts, specifically his involvement with Maddie's Fund, and the statement that "no one at Maddie's Fund was aware of Alexanian or expressed any affiliation with his organization."[6] Plaintiff alleges this is inaccurate, as he was in fact pursuing a grant from Maddie's Fund, and he has attached an email from a Maddie's Fund representative to that effect.[7]

The fourth statement alleged to be defamatory was made in the Correction, where plaintiff complains that he was mischaracterized as an "animal-rights activist," thereby painting him as an extremist.[8]   Plaintiff alleges that "[c]haracterizing primarily an advisor and leader in the field of animal control as an 'animal rights' organization is similar to characterizing a Muslim Imam as an 'extremist,' and thus infer that he is a terrorist."[9]

Plaintiff alleges that as a result of the defamatory Story and defendants' refusal to issue a meaningful correction, he has suffered damages in the form of, *inter alia*, lost contributions, lost volunteers, lost reputation, and had been forced to expend funds and labor "to explain the falsehoods to the readers of both the on-line edition of Defendants' newspaper, THE ADVERTISER, which reaches a global market, and the paper edition, which reaches precisely the readership which Plaintiff was campaigning to educate and enroll in his efforts in the furtherance of his goal and mission."[10]

---

[6]See *Story*.

[7]*First Amended Complaint* (rec. doc. 4), p. 8, ¶ 21.

[8]*Ibid.*, p. 9, ¶ 23.

[9]*Ibid.*

[10]*Ibid.*, pgs. 11, 12, ¶ 30.

*Applicable Law*

The Fifth Circuit has recently ruled that "Louisiana law, including the nominally-procedural Article 971," is to be applied by the federal court in a diversity case, as is this one. Henry v. Lake Charles American Press LLC, ___ F.3d ___, *2, 2009 WL 989190 (5th Cir. 2009). La. C.C.P. art. 971 is "a procedural device to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press." Henry, at *3, quoting Lee v. Pennington, 830 So.2d 1037, 1041 (La. App.4th Cir. 2002). As explained by the Fifth Circuit, La. C.C.P. art. 971 was passed in reaction to a concern over the use or abuse of lawsuits that chill the exercise of First Amendment rights – "strategic lawsuits against public participation," or "SLAPPs." La. C.C.P. art. 971 reads in pertinent part as follows:

> A.      (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.
>
> (2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
>
> (3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.
>
> B.      In any action subject to Paragraph A of this Article, a prevailing party in a special motion to strike shall be awarded attorney fees and costs.
>
> * * *

As explained in Henry, La. C.C.P. art. 971 sets up a burden-shifting analysis, where the defendant must first "'establish [] that a cause of action against him arises from an act by him in

furtherance of the exercise of his right of petition or free speech under the United States or

Louisiana Constitution in connection with a public issue." Henry,  at *4, citing Starr v.

Boudreaux, 978 So.2d 384, 388-89 (La.App. 1st Cir. 2007).  If such a showing is made, then "the

burden shifts to the plaintiff to demonstrate a probability of success on his claim." Id.  If the

plaintiff cannot demonstrate a probability of success on his claim, the court dismisses the claim –

if he can, the matter continues.  Id.

In order to demonstrate a probability of success on his claim, a plaintiff opposing an

Article 971 motion, as outlined in Henry, must do the following:

> A plaintiff contesting an Article 971 motion must show a probability that she will
> be able to establish all of the elements of her tort claim.  Baxter, 847 So. 2d at
> 233.[11]
>
> * * *
>
> "To establish a probability of prevailing on his claim, a plaintiff must state and
> substantiate a legally sufficient claim.  This is done through a prima facie showing
> of facts sufficient to sustain a favorable judgment."  Baxter, 847 So.2d at 231-32.
> This requires more than that which is necessary to survive a normal motion to
> dismiss, as "a defamation plaintiff must produce evidence of sufficient quality and
> quantity to demonstrate that he will be able to meet his burden of proof at trial."
> Estiverne v. Times-Picayune, L.L.C., 950 So.2d 858, 860 (La.App.4th Cir.
> 2006)(quotation marks omitted).  As one Louisiana court has noted, establishing a
> probability of success is a "difficult burden."  Baxter, 847 So.2d at 235.  The
> burden is justified, however, as "the necessity of protecting our constitutional
> rights of free speech and petition, particularly when exercised in relation to public
> issues or matters of public interest, requires the imposition of this burden on a
> plaintiff who brings a defamation action impacting these rights."  Id.

In Kennedy v. Sheriff of East Baton Rouge, 935 So.2d 669, 674-75 (La. 2006), the

Louisiana Supreme Court outlined the tort of defamation as follows:

> We most recently addressed the tort of defamation in Costello v. Hardy, 03-1146
> (La.1/21/04), 864 So.2d 129. Therein, we noted that defamation is a tort involving
> the invasion of a person's interest in his or her reputation and good name.

---

[11]Baxter v. Scott, 847 So.2d 225, 231 (La. App. 2d Cir.), vacated as moot, 860 So.2d 535 (La. 2003).

Costello, 03-1146 at 12, 864 So.2d at 139. Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Id., quoting Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; Restatement (Second) of Torts § 558 (1977). The fault requirement is generally referred to in the jurisprudence as malice, actual or implied. Costello, 03-1146 at 12, 864 So.2d at 139.

By definition, a statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule. Costello, 03-1146 at 13, 864 So.2d at 140; Trentecosta, 96-2388 at 10, 703 So.2d at 559 ( citing Restatement (Second) of Torts § 559 cmt. e (1977)). In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Costello, 03-1146 at 13, 864 So.2d at 140; Madison v. Bolton, 234 La. 997, 102 So.2d 433, 438 (La.1958). Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. Costello, 03-1146 at 13-14, 864 So.2d at 140; Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196, 198 (La.1980). When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Costello, 03-1146 at 14, 864 So.2d at 140. Injury may also be presumed. Id. When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault) and injury. Id.

When the plaintiff in a defamation action is a public figure, he must prove by clear and convincing evidence that the defamatory statement was made with actual malice, "i.e., that the defendant either knew the statement was false or acted with reckless disregard for the truth." Starr v. Boudreaux, 978 So.2d 384, 390, citing Costello, 864 So.2d at 140-141. To establish reckless disregard, "the plaintiff must show that the false publication was made with a high degree of awareness of probable falsity, or that the defendant entertained serious doubt as to the truth of his publication." Starr, at 390, citing Tarpley v. Colfax Chronicle, 650 So.2d 738, 740

(La. 1995). Such conduct would be "typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have put it in circulation. Starr, at 390, citing Kennedy, 935 So.2d at 688-689.

A person becomes a public figure for a limited purpose when he voluntarily injects himself into a particular public controversy with the intent to influence the resolution of the issues. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997 (1974). "An individual who voluntarily injects himself or is drawn into a particular controversy becomes a public figure for this limited range of issues. . . .such persons invite attention and comment and assume special prominence in the resolution of public questions." Starr, 978 So.2d at 391, citing Gertz, 418 U.S. at 345 and 351, 94 S.Ct. at 3009 and 3013.

### *Argument and Discussion*

<u>Defendant's prima facie burden</u>

Defendants argue they have met their prima facie burden that plaintiff's cause of action against them arises from acts in furtherance of their exercise of their constitutional right to free speech in connection with a public issue. Defendants cite several Louisiana cases finding the publication of newspaper articles and broadcast of television news reports are acts related to free speech rights.[12] Defendants contend the Story and Correction were made in connection with a public issue, as the News Release, the Story and the Correction all "revolved around the conduct of a public official (Police Chief Craft), the practices of a government agency (the Division of Animal Control), the criticism of both by a nonprofit animal rights organization and its executive

---

[12]*Memorandum in Support of Defendants' Special Motion to Strike Pursuant to Louisiana C.C.P. Art. 971* (rec. doc. 46), p. 9, citing <u>Starr v. Boudreaux</u>, 978 So.2d 384 (1st Cir. 2007); <u>Johnson v. KTBS, Inc.</u>, 889 So.2d 329, 332 (La.App. 2 Cir. 2004).

director (CAN and Alexanian), and claims of previous grants allegedly obtained by Plaintiff.[13] Defendants argue these issues affect the public at large and are commonly reported by the news media.

In opposition, plaintiff argues the statements made were not in connection with a "public issue" because The Advertiser is a privately-owned newspaper and is not a public forum, as he argues is required by definition in La. C.C.P. art. 971F(1)(c). Furthermore, plaintiff contends that very little of the Story dealt with affairs of public interest, and most of the Story "overwhelmingly dealt with Plaintiff's credentials and accomplishments, providing rebuttal to LCG, not the matter contained in his News Release."[14] Plaintiff concedes that "[t]he matter of public interest may be the operation of the animal shelter in Lafayette, who was criticized in Plaintiff's News Release" but argues that "Plaintiff's previous and future grant efforts"[15] were not matters of public interest, and were defamed.

Considering the facts and the applicable law, the undersigned concludes that defendants have met their prima facie burden, and have established that plaintiff's claims arise from acts in furtherance of defendants' free speech rights, and were made in connection with a public issue. The acts complained of were statements made in newspaper articles. Whether The Advertiser is privately-owned or publicly-owned is irrelevant; there is nothing in Louisiana law which affords free speech rights only to publicly-owned newspapers. The jurisprudence analyzing La. C.C.P. art. 971 is extensively comprised of cases alleging defamation based on publications made as

---

[13]*Ibid.*, p. 11.

[14]*Plaintiff's Memorandum in Opposition to Motion to Strike* (rec. doc. 76), p. 14.

[15]*Ibid.*

stories in privately-owned newspapers.[16]  Furthermore, La. C.C.P. art. 971F(1)(c) contains no reference to newspaper ownership status.  It provides only that first amendment protection is afforded to, "[a]ny written or oral statement or writing made in . . . a public forum in connection with an issue of public interest," among other things.

Plaintiff's argument that his prior grant accomplishments and credentials are not matters of public interest are not persuasive.  Standing alone they well may not be, but they became so when plaintiff issued his News Release criticizing the practices and policies of the animal control shelter and Parish officials, while touting himself and his agency as being "one of the lead agencies in procuring recovery funding for over one dozen Louisiana Parish animal control agencies" and as "instrumental in procuring a previous major grant for Lafayette Parish Animal Control...."[17]  Plaintiff made his grant accomplishments, by his own self-lauding, a matter of public interest.

The undersigned finds defendants have met their burden of showing plaintiff's cause of action arises from acts by defendants in furtherance of the exercise of their right to free speech under the United States or Louisiana Constitution in connection with a public issue.  Therefore, the burden now shifts to plaintiff to demonstrate a probability of success on his claim.

Plaintiff's burden to demonstrate a probability of success on his claim.

---

[16]See Starr v. Boudreaux, 978 So.2d 384 (La. App. 1 Cir. 2007); Henry v. Lake Charles American Press LLC, -- F.3d --, *2, 2009 WL 989190 (5th Cir. 2009); Estiverne v. Times-Picayune, L.L.C., 950 So.2d 858, 860 (La.App.4th Cir. 2006); Lee v. Pennington, 830 So.2d 1037 (La.App. 4 Cir. 2002).

[17]See News Release, "Lafayette Government Rejects Major Donation," attached hereto.

I.      *Limited purpose public figure*

Defendants argue plaintiff is a public figure, and thus must prove actual malice as an element of his defamation claim.  Defendants argue plaintiff injected himself into a public controversy when he sent his News Release to The Advertiser, criticizing the policies and operations of, and the governmental officials responsible for, the animal control shelter, and thereby became a public figure for the limited purpose of the controversy surrounding the subjects of the News Release.  As such, defendants argue, the plaintiff must show, in addition to all of the other elements of a defamation claim, that defendants acted with actual malice when they published the articles; i.e., plaintiff must show that defendants either knew the statements were false or acted with reckless disregard for the truth when the statements were made.

In opposition, plaintiff argues he is not a limited purpose public figure, as he did not inject himself into a pre-existing public controversy.[18]  Plaintiff argues defendants created the controversy with their articles, which defamed, *inter alia*, his grant accomplishments.  Plaintiff argues the News Release only tangentially mentioned the grants plaintiff had previously obtained, yet the defaming articles focused on those grants, which plaintiff argues were not a matter of public concern or controversy.  Plaintiff argues  "the issues raised by the News Release and the defamatory report were issues of private disputes between Plaintiff, Roicy Duhon animal shelter and Lafayette government."[19]

---

[18]*Plaintiff's Memorandum in Opposition to Motion to Strike* (rec. doc. 76), p. 18, citing Hutchinson v. Proxmire, 443 U.S. 111, 130, 136, 99 S.Ct. 2675, 2688 (1979).

[19]*Ibid.*, p. 23.

The undersigned disagrees.  The animal shelter and its practices, including its methods of euthanasia as well as the policies of Parish officials in accepting or rejecting grants for the benefit of the animals contained therein, are matters of public concern and controversy.  Plaintiff's argument that his News Release only tangentially mentioned his grant accomplishments is not persuasive – the title of the News Release is "Lafayette Government Rejects Major Donation," and the first sentence touts plaintiff's Companion Animal Network (CAN) as being "one of the lead agencies in procuring recovery funding" and describes the rejected grant as "a follow-up major grant."[20]  Plaintiff's News Release labeled Police Chief Craft's behavior in declining the grant as "aberrant," and stated CAN had begun a "formal legal investigation" into, *inter alia,* "grant revenue practices. . . ."[21]

The undersigned finds plaintiff injected himself into a public issue, the operations of the animal shelter, then proceeded to create or exacerbate a public controversy surrounding its operations and policies, including its refusal to accept the grant of sodium pentobarbital, while lauding his other grant accomplishments.   Thus, plaintiff is a limited purpose public figure for all subjects addressed in his News Release.

II.    *Actual Malice*

In order for plaintiff's action to survive the motion to strike, he must show facts sufficient to sustain a favorable judgment, and as a limited public figure, he must show actual malice.  That is, he must show that defendants either knew the statement was false or acted with reckless disregard for the truth.  Starr, 978 So.2d at 390, citing Costello, 864 So.2d at 140-141.  To

---

[20]See *News Release*, attached hereto.

[21]*Ibid.*

establish reckless disregard, "the plaintiff must show that the false publication was made with a high degree of awareness of probable falsity, or that the defendant entertained serious doubt as to the truth of his publication." Starr, 978 So.2d at 390, citing Tarpley v. Colfax Chronicle, 640 So.2d 738, 740 (La. 1995).

Plaintiff points to the headline of the article reading "allegations prove untrue" and the text of the Story, wherein it was acknowledged the grant was not accepted, as proof defendants must have known their publication was false, and thus acted with actual malice. However, the headline did not refer solely to plaintiff's allegations regarding denial of the sodium pentobarbital grant, which the text of the article acknowledges was denied, but the entirety of plaintiff's News Release.

The accusations made by plaintiff in the News Release were much broader than the refusal of the sodium pentobarbital grant, and included the following: Craft's refusal to respond to plaintiff's emails and conversations about the sodium pentobarbital grant; a description of Craft's behavior in not accepting the grant as "inexplicable," "questionable," and "abberant;" an anonymous quote from a sodium pentobarbital manufacturer describing Craft and other officials as "those *&%$#" and stating that he "would not want my product in their hands as they may jeopardize my DEA license to sell the drug as they would probably not be competent enough to store it safely and securely;" and, a statement that CAN, plaintiff's organization, had "begun a formal legal investigation into the practices of Lafayette Parish . . . ."[22]

_____

[22]See *News Release*.

The undersigned finds the conflict between the general headline and the limited text of the Story regarding non-acceptance of the sodium pentobarbital grant does not constitute proof of actual malice.

In addition to arguing that the headline and content of the story itself show actual malice, plaintiff cites several actions by defendant Brown he contends are evidence of actual malice, including the following: Brown's failure to keep the recording of his interview with Laura Lanza regarding plaintiff's role in obtaining funding for the animal pick up trucks; his failure to pursue a Maddie's Fund representative familiar with plaintiff before reporting no one with Maddie's Fund was familiar with plaintiff or his organization; his failure to seek out corroborating sources for plaintiff's claims regarding his obtaining grants for the animal trucks and sodium pentobarbital; and, Brown's failure to confirm the improper practices regarding intermingling of puppies and euthanasia.

In support of the motion to strike, defendants introduced the Affidavit of Jason M. Brown.[23] In his affidavit, Brown detailed the contacts and conversations he had with plaintiff, Police Chief Craft, Laura Lanza, and the national office of Maddie's Fund. In his affidavit, Brown stated "the facts, quotations, and statements contained in the Story are not fabrications, misquotations, or the product of Affiant's imagination" and that "[p]rior to the News Release, Affiant had never heard of Alexanian or CAN, and did not harbor any hidden bias or animosity toward Alexanian or CAN."[24]

---

[23]"Exhibit A," to *Memorandum in Support of Defendant's Special Motion to Strike Pursuant to Louisiana C.C. art. 971* (rec. doc. 46).

[24]*Ibid.*

The undersigned finds that even if all of plaintiff's allegations regarding Brown's contacts and communications, or lack thereof, are true, these actions merely show negligence and lack of thoroughness on Brown's part, not actual malice. The Supreme Court has stated, "failure to investigate will not alone support a finding of actual malice. . . [but] the purposeful avoidance of the truth is in a different category."[25]   Plaintiff does not necessarily complain Brown did not investigate; rather, that Brown did not thoroughly or adequately investigate. Furthermore, plaintiff has introduced no evidence that defendants, Brown in particular, purposefully avoided the truth when it investigated and published the Story about plaintiff's News Release and the allegations and assertions made therein.

Neither has plaintiff introduced any evidence supporting actual malice in the Correction. Plaintiff complains that defendants' defamed him therein by describing him as an "animal rights activist." While plaintiff apparently sees a meaningful difference between his self-described role as an "animal control policy expert" and defendants' characterization of him as an "animal rights activist,"[26] the undersigned does not. In support of their motion to strike, relevant to the Correction, defendants submitted the "Affidavit of Edward "Ted" Power,"[27]  wherein Power attests as follows:

> 13)    At the time of the publication of the Correction, Affiant believed Alexanian to be an "animal-rights activist" as that phrase is commonly used in casual conversation;

---

[25]Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 109 S.Ct. 2678 (1989)(internal citations omitted).

[26]*First Amended Complain*t (rec. doc. 4), p. 9.

[27]"Exhibit B," to *Memorandum in Support of Defendant's Special Motion to Strike Pursuant to Louisiana C.C. art. 971* (rec. doc. 46).

14)     In the Correction, Affiant did not use the phrase "animal-rights activist" to implicitly call Alexanian a terrorist or otherwise insult him;

15)     In the Correction, Affiant used the phrase "animal-rights" activist" only to describe Alexanian as a person who publicly advocates the rights of animals;

16)     Prior to the August 28, 2006, "News Release," Affiant had never heard of Alexanian or CAN, and did not harbor any hidden bias or animosity toward Alexanian or CAN.

.

Plaintiff has submitted no evidence that describing an individual as an "animal rights activist" is necessarily defamatory. Moreover, even if such a description could be defamatory, plaintiff has introduced no evidence that defendants uttered it with actual malice.

For the reasons given above, the undersigned finds plaintiff has not met his burden of proving all the elements of his defamation claim based on defendants' publication of the Story or the Correction; particularly, plaintiff has not produced any evidence of actual malice on defendants' part.

### *Conclusion and Recommendation*

The undersigned finds defendants have met their initial burden under La. C.C.P. art. 971, and have established plaintiff's cause of action against them arose from an act by them in furtherance of their rights to free speech under the United States or Louisiana Constitution in connection with a public issue. The undersigned also finds plaintiff is a public figure for the limited purpose of the controversy surrounding the News Release and the subject Story and Correction, and plaintiff has not satisfied his burden of proving all the elements of his defamation claim; particularly, plaintiff has not introduced evidence of actual malice on defendants' part.

Plaintiff has not satisfied his burden of proving all the elements of his defamation claim. and plaintiff has not opposed defendants' motion to dismiss his other claims.[28]  For the reasons given above,

**IT IS RECOMMENDED** that Defendant's Special Motion to Strike Pursuant to Louisiana C.C.P. art. 971 (rec. doc. 46) be **GRANTED** as follows:

1)      Plaintiff's claims be **DISMISSED WITH PREJUDICE**;

2)      Defendants be awarded reasonable attorney fees and costs.

**IT IS FURTHER RECOMMENDED** that defendants be ordered to submit an affidavit of attorneys' fees and costs to be filed into the record no later than 10 days after final judgment is entered in this matter, if the court adopts this Report and Recommendation, and the defendants' motion is granted.

**IT IS FURTHER RECOMMENDED** that plaintiff be given 10 days to file an opposition to any affidavit of attorneys' fees and costs submitted by defendants.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or responses to the district judge at the time of filing.

---

[28]Pro se plaintiff also brought causes of action for common law misappropriation, common law unfair competition, negligent hiring, training and supervision, fraudulent and negligent misrepresentation, and civil conspiracy. Defendants moved to dismiss these claims either as not cognizable under Louisiana law, or dependent on plaintiff's defamation claim.  Plaintiff has not opposed the motion to dismiss as to these claims, and the defendants' reasons for dismissal are meritorious.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See **Douglass v. United Services Automobile Association**, 79 F.3d 1415 (5th Cir.  1996).

Signed at Lafayette, Louisiana, on June 16, 2009.


_____
Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)